577 So.2d 1355 (1991)
Andrea A. Maria WRIGHT, Appellant,
v.
Richard L. WRIGHT, Appellee.
No. 90-01016.
District Court of Appeal of Florida, First District.
March 29, 1991.
Rehearing Denied May 7, 1991.
Tyrie A. Boyer of Boyer, Tanzler & Boyer, Jacksonville, for appellant.
Nancy Staff Slayden and William J. Haley of Brannon, Brown, Haley, Robinson & Cole, P.A., Lake City, for appellee.
PER CURIAM.
This cause is before us on appeal from a final judgment of dissolution. Mrs. Wright, appellant herein, challenges the award of $2,000 per month permanent periodic alimony, and the award of less than all *1356 of her attorney fees and costs. Finding merit in these challenges, we reverse.
The parties married December 10, 1966. Four children were born of the marriage. At the time of the marriage, appellee, Dr. Richard Wright, was 25 years of age, a veteran of the United States Navy, and employed as a policeman in Jacksonville. Mrs. Wright was 23 years of age, had a high school education, and was employed at a Jacksonville Pic-N-Save. Mrs. Wright had received training as an IBM keypunch operator prior to the marriage, a skill that is now practically obsolete.
Shortly after the marriage, the parties agreed that Dr. Wright would continue his education and become a physician. During the first part of his undergraduate education, Dr. Wright continued to work as a police officer and perform various odd jobs while attending school at night. Mrs. Wright assisted in these odd jobs and also took care of the parties' first child.
Later on, the parties moved to Gainesville so that Dr. Wright could pursue a premedical curriculum at the University of Florida. Dr. Wright continued to hold employment while the parties lived in Gainesville. A second child was born. Mrs. Wright took care of the parties' two children and held part-time employment.
After Dr. Wright completed his undergraduate education, the parties moved to Miami so that he could pursue his medical education at the University of Miami's medical school. The parties had a third child. Dr. Wright continued to work during his first two years as a medical student but was employed less frequently during his third and fourth years. Mrs. Wright held part-time employment.
After Dr. Wright obtained his medical degree, the parties returned to Jacksonville where Dr. Wright completed his residency. During appellee's residency, a fourth child was born. After Dr. Wright completed his residency, the parties moved to Lake City, where Dr. Wright established his practice. In June of 1981, Dr. Wright incorporated his practice into a professional association (P.A.).
Dr. Wright's practice and P.A. were immediate successes. Dr. Wright was very industrious, working long hours. Mrs. Wright was of significant assistance in the progress of Dr. Wright's practice. She was president of the medical society auxiliary and periodically performed bookkeeping services for the medical practice. Dr. Wright testified that Mrs. Wright was a good wife, a good mother, and a good homemaker.
The parties enjoyed a standard of living which could accurately be described as lavish. Dr. Wright took flying lessons and bought an airplane, which he ultimately sold. Dr. Wright also took up automobile racing and purchased three race cars. The parties took up rodeo sports and purchased several horses. By the mid-1980s, however, the parties were in dire financial circumstances. The parties initially sought protection under Chapter 11 of the Bankruptcy Code. Subsequently, they converted the Chapter 11 proceeding to a Chapter 7 liquidation proceeding. The bankruptcy court entered an order of discharge on November 3, 1986. During this bankruptcy proceeding, the parties sold their home, which Mrs. Wright described as the best in Lake City.
The parties separated during the pendency of the bankruptcy proceeding, in September 1986. After bankruptcy, the parties began anew with limited assets. They purchased a new home for $150,000, but the encumbrance on this home was equivalent to its value. Other assets included: personal property in Dr. Wright's possession having a value of $3,000; an insurance policy insuring Dr. Wright's life in the sum of $700,000, having a cash value of $2,000; a Jeep Cherokee used by Mrs. Wright having a value of $12,000; a motor vehicle used by the oldest son of the parties having a value roughly equivalent to the lien on the vehicle; household furniture, farm implements, and horses in Mrs. Wright's possession worth $21,000; and the P.A., which the trial court valued at $82,000.
*1357 The parties continued to have certain liabilities after bankruptcy. At the time of the dissolution, these liabilities included: an indebtedness owed one Hugh Wilson in the amount of $13,886 incurred to repurchase the furniture, farm implements, and horses from the trustee in bankruptcy; a prebankruptcy indebtedness to Hugh Wilson in the amount of $13,520, which was voluntarily reassumed; an indebtedness to one Billy Arrington in the amount of $5,400; and an incumbrance on Mrs. Wright's Jeep Cherokee in the amount of $10,000. There was also testimony that the P.A. had an income tax liability of approximately $20,000 and that Dr. Wright owed approximately $10,000 on a student loan.
Dr. Wright earned a substantial income before and after bankruptcy. From his P.A., Dr. Wright receives a gross income of $233,000 per year. However, Dr. Wright's certified public accountant testified, and the trial court apparently found, that Dr. Wright's net, after-tax income was somewhere between $132,000 and $143,000 per year.
In contrast, Mrs. Wright did not have a history of regular employment. She worked, at times, as a bookkeeper for the P.A. Dr. Wright's certified public accountant testified that Mrs. Wright was capable of earning $10,000 to $12,000 annually in the Lake City area. Mrs. Wright testified that she hoped to return to school, complete her education, and ultimately become a guidance counselor. She did not, however, testify to the amount of time it would take to complete her education nor did she testify to what she expected to earn as a guidance counselor.
Under the final judgment, each of the parties received approximately equal shares of the marital estate. Mrs. Wright received the Jeep Cherokee valued at approximately $12,000, the furniture, farm equipment and horses valued at $21,000, and $50,000 in lump-sum alimony. Dr. Wright received the P.A. valued at $82,000, his life insurance policy worth approximately $2,000, personal property valued at $3,000. Dr. Wright also received the parties' interest in the marital home and the right to sell the home. Dr. Wright was required to assume responsibility for all of the debts.
The trial court awarded Mrs. Wright $2,000 per month permanent periodic alimony and rehabilitative alimony in an amount not to exceed the lesser of Mrs. Wright's actual educational expenses or $500 per month for four years. Mrs. Wright received primary residential responsibility for the remaining minor children and child support in the amount of $500 per month per child.[1]
The trial court awarded Mrs. Wright only a portion of the attorney fees and costs which she incurred, because Mrs. Wright employed an attorney from Jacksonville. The trial court found that Mrs. Wright's selection of counsel from Jacksonville, some 60 miles distant from Lake City, was not unreasonable. The trial court also found that Mrs. Wright's counsel charged a reasonable hourly fee and that the time spent by counsel was reasonable. Inconsistently, the trial court found that since Mrs. Wright could have obtained local counsel, despite the small size of the community and prominence of her husband in the community,[2] the hourly rate allowed to Mrs. Wright's counsel would be limited to the rate found reasonable in Lake City, and travel hours of counsel would not be allowed.
On the record before us, we must agree with Mrs. Wright that the trial court erred in limiting its award of permanent periodic alimony to $2,000 per month. Florida law is well settled that the primary *1358 criteria to consider in making an alimony award are the needs of one spouse and the ability of the other spouse to meet those needs. The award should provide for the receiving spouse's needs as they were established during the marriage of the parties. Canakaris v. Canakaris, 382 So.2d 1197, 1201-1202 (Fla. 1980); Thomas v. Thomas, 571 So.2d 499, 503 (Fla. 1st DCA 1990); Kirkland v. Kirkland, 568 So.2d 494, 496 (Fla. 1st DCA 1990). The court must consider the award of permanent periodic alimony in light of each party's need, capacity to earn, and ability to pay, the standard of living which the parties enjoyed during the marriage, and the other factors in Section 61.08, Florida Statutes. When so considered and tested against the standard of reasonableness set forth in Canakaris, it is clear that Mrs. Wright has been shortchanged. If Mrs. Wright elects to work as a bookkeeper and continues to receive $2,000 per month alimony, her annual income before taxes will be approximately $34,000 to $36,000. With this amount, she will be able to meet approximately half the expenses listed in her postseparation financial affidavit. The record contains no evidence that Mrs. Wright would fare any better if her rehabilitation were successful and she became a guidance counselor.
In contrast, Dr. Wright will continue to enjoy a level of affluence which far exceeds that enjoyed by his former spouse. After paying permanent periodic alimony, rehabilitative alimony, child support, and lump-sum alimony under the final judgment, Dr. Wright will be left with an after-tax income of approximately $80,000 to $91,000.[3] Although Dr. Wright was required to assume responsibility for the parties' debts, these debts are not extensive when measured against Dr. Wright's disposable income. After the children become emancipated and Dr. Wright discharges the debts and his obligations to pay lump-sum and rehabilitative alimony,[4] Dr. Wright's net after-tax income will be approximately $110,000 per year. There is, thus, a gross disparity in the parties' earning capacities and standards of living, which is unreasonable under the facts here. The alimony awarded is insufficient to provide for the needs of the wife and is not commensurate with the husband's ability to pay and standard of living. We therefore reverse the award of $2,000 per month permanent periodic alimony.
We also reverse the award of attorney fees and costs. The trial court found that Mrs. Wright's counsel charged a reasonable hourly rate for his services, expended a reasonable number of hours on the case, and that Mrs. Wright did not act unreasonably in selecting counsel 60 miles distant from her residence, a relatively small community. Because the trial court found Mrs. Wright had no ability to pay for the cost of her representation, the trial court should have granted Mrs. Wright all of her attorney fees and costs.
The awards of alimony, attorney fees, and costs[5] are therefore reversed, and this cause is remanded for proceedings consistent herewith.
BOOTH and MINER, JJ., and WENTWORTH, Senior Judge, concur.
NOTES
[1] At the time of the hearing below, which concluded on March 15, 1988, the children were ages 9, 12, 17, and 18. There is no issue herein as to child custody or support.
[2] This finding was based on testimony of two Lake City lawyers that they would have represented her had she so requested.
[3] Because Dr. Wright's alimony payments are tax deductible, his after-tax income will actually exceed these figures.
[4] The final decree was entered in May 1989. Obligations imposed under decree for lump-sum alimony will be discharged in August 1994, and rehabilitative alimony will be concluded in May 1993. Presently, two children are minors.
[5] Our review of the record has shown that the trial court's distribution of assets and liabilities has been well-reasoned. We therefore see no need for reconsideration of the entire judgment.